Oxford Health Plans (NY), Inc. v Biomed Pharms., Inc. (2020 NY Slip Op 01922)





Oxford Health Plans (NY), Inc. v Biomed Pharms., Inc.


2020 NY Slip Op 01922


Decided on March 18, 2020


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 18, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
LEONARD B. AUSTIN
SYLVIA O. HINDS-RADIX
HECTOR D. LASALLE, JJ.


2017-02971
 (Index No. 24093/12)

[*1]Oxford Health Plans (NY), Inc., et al., appellants,
v
Biomed Pharmaceuticals, Inc., respondent.


Robinson & Cole LLP, New York, NY (Michael H. Bernstein of counsel), for appellants.
McDermott Will & Emery LLP, New York, NY (Andrew B. Kratenstein of counsel), for respondent.



DECISION & ORDER
In an action to recover damages for fraudulent misrepresentation and tortious interference with contract, the plaintiffs appeal from an order of the Supreme Court, Suffolk County (Arthur G. Pitts, J.), dated February 16, 2017. The order granted the defendant's motion for summary judgment dismissing the amended complaint, denied the plaintiffs' cross motion for summary judgment on the amended complaint, and denied the plaintiffs' motion to strike certain evidence and legal arguments allegedly presented for the first time in the defendant's reply papers.
ORDERED that the order is affirmed, with costs.
This action arises from the defendant, Biomed Pharmaceuticals, Inc.'s, submission of claims for health insurance benefits to the plaintiff Oxford Health Plans (NY), Inc., and its claims administrator, the plaintiff United Healthcare Services, Inc. The defendant is a pharmacy and home infusion service that provides medications for patients with chronic medical conditions such as hemophilia and immunodeficiency disorders. The plaintiffs are health maintenance organizations that provide healthcare insurance coverage to their members, the terms of which are described in Certificates of Coverage. The plaintiffs provide a network of participating health care providers, whom they reimburse at negotiated rates pursuant to contracts between the plaintiffs and the in-network providers. Pursuant to the relevant insurance plans, members may seek services from out-of-network providers, such as the defendant, but are generally subject to deductible and coinsurance obligations. At all relevant times, the defendant was an out-of-network provider. The 27 patients at issue in this litigation (hereinafter the patients) were members enrolled in the plaintiffs' healthcare plans that permitted them to receive contracted services from out-of-network providers such as the defendant.
After the patients received services from the defendant, the defendant submitted insurance benefits claims to the plaintiffs on behalf of the patients, pursuant to assignment agreements between the defendant and the patients. The defendant submitted claims to the plaintiffs on a form published by the federal government, which requires information concerning, inter alia, the provider's identity and the fee charged, and includes no representation concerning the collection of deductibles, coinsurance, or co-payments, the financial condition of the patient, or whether the [*2]patient requested or obtained a financial hardship waiver.
The defendant submitted claims to the plaintiffs based upon the average wholesale price (hereinafter AWP) of the particular drug. However, in determining the amount to reimburse for a claim, pursuant to the Certificates of Coverage, the plaintiffs reimbursed out-of-network providers such as the defendant not based upon the amount of the claim, but rather, based upon what is "usual, customary and reasonable" (hereinafter UCR) in the industry, and by deducting any patient responsibility therefrom, such as deductible and/or co-payment amounts. Accordingly, as acknowledged by the plaintiffs, the Certificates of Coverage provide "a ceiling for fees charged based on UCR charge," and when the provider's fees exceed the UCR charge, the plaintiffs "will only pay a percentage of the UCR." As such, the plaintiffs paid the defendant 70% of the UCR rate, and did not make payments based upon the AWP amount charged by the defendant.
After submitting claims to the plaintiffs, the defendant would first learn about the patient's responsibility for co-payments and/or deductibles if the plaintiffs withheld an amount from the reimbursement paid to the defendant. The defendant could then seek to collect the balance from the patients, as these deductible and co-payment amounts are owed to the out-of-network provider, i.e., the defendant, and not to the insurer, i.e., the plaintiffs. The defendant's practice was to bill the patients directly for the balance that had not been paid by the plaintiffs, and the patients were permitted to apply for a financial hardship waiver of some or all amounts owed. Hardship waivers were not routinely awarded, and were not designed to attract patients or influence a patient's choice. The plaintiffs' Certificates of Coverage for the 27 patients do not bar financial hardship waivers, do not provide guidelines for seeking waivers, and the plaintiffs did not require the patients to notify them if they had applied for a financial hardship waiver.
In 2008, the plaintiffs investigated claims related to 17 of the defendant's patients who were members of the plaintiffs' insurance plan, including "B.K.," a very high-cost patient who was a child with severe hemophilia. The plaintiffs concluded that the defendant had improperly waived coinsurance and deductible payments for 6 of the 17 patients, including B.K., and reduced B.K.'s reimbursements that were paid to the defendant by 30 percent, which amounted to nearly $1.5 million. In response, the defendant commenced a section 502(A)(1)(B) of the Employee Retirement Income Security Act of 1974 (Pub L 93-406, tit I, § 502[A][1][B], 88 Stat 829, codfied at 29 USC § 1132[a][1][B]; hereinafter ERISA) action (hereinafter the federal action) against the plaintiffs in federal court seeking relief stemming from the benefit reductions for B.K. In denying the plaintiffs' motion to dismiss the federal action, the federal court held that the defendant's waivers of B.K.'s co-payment obligations constituted "payment" of such amounts, and were not a violation of the plaintiffs' terms of coverage. Following a nonjury trial, the federal court applied the arbitrary and capricious standard and dismissed the defendant's claim, holding that the defendant could not overcome the high level of deference owed to a plan administrator's determination in an ERISA context, and as the defendant failed to collect financial information from the family of B.K. to substantiate a hardship waiver, it was not entitled to payment of the benefit reductions. However, the federal court again held that the defendant's waivers of B.K.'s co-payment obligations did not constitute a failure by B.K. to "pay" his deductible or coinsurance.
The plaintiffs subsequently commenced this action against the defendant, and in an amended complaint, asserted causes of action to recover damages for fraudulent misrepresentation of billed charges and tortious interference with the plaintiffs' contractual relationship with the 27 patients at issue herein, including B.K. After the completion of discovery, the defendant moved for summary judgment dismissing the amended complaint, the plaintiff cross-moved for summary judgment on the amended complaint, and the plaintiffs moved to strike certain evidence and legal arguments allegedly presented for the first time in the defendant's reply papers. In an order dated February 16, 2017, the Supreme Court granted the defendant's motion for summary judgment dismissing the amended complaint, denied the plaintiffs' cross motion for summary judgment on the amended complaint, and denied the plaintiffs' motion to strike. The plaintiffs appeal.
Summary judgment "shall be granted if, upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in [*3]directing judgment in favor of any party" (CPLR 3212[b]). "The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853). Once the movant makes a prima facie showing that it is entitled to judgment as a matter of law, the burden shifts to the non-movant to demonstrate the existence of factual issues requiring a trial (see Kaluga v Korytowsky, 269 AD2d 566, 566). "[C]onclusory assertions are insufficient to demonstrate the [existence] of any material issues of fact" (Ayotte v Gervasio, 81 NY2d 1062, 1062).
The first cause of action, to recover damages for fraudulent misrepresentation, alleges that the defendant misrepresented to the plaintiffs the fees that it charged to the patients, as the amounts cited in the defendant's claim submissions were higher than what the defendant had agreed to accept from the patients. It further alleges that when submitting claims to the plaintiffs, the defendant knew that it would not seek to collect deductible and co-payment amounts from the patients, thereby inflating the amount of reimbursement sought by the defendant from the plaintiffs. "To recover damages for fraudulent misrepresentation, a plaintiff must prove (1) a misrepresentation or an omission of material fact which was false and known to be false by the defendant, (2) the misrepresentation was made for the purpose of inducing the plaintiff to rely upon it, (3) justifiable reliance of the plaintiff on the misrepresentation or material omission, and (4) injury" (Bernardi v Spyratos, 79 AD3d 684, 687; see Lewis v Wells Fargo Bank, N.A., 134 AD3d 777, 778).
We agree with the Supreme Court's determination granting that branch of the defendant's motion which was for summary judgment dismissing the first cause of action and denying that branch of the plaintiffs' cross motion which was for summary judgment on that cause of action. The defendant established its prima facie entitlement to judgment as a matter of law dismissing the first cause of action, and the plaintiffs failed to raise a triable issue of fact in opposition. First, we agree with the court's determination that the defendant did not make misrepresentations to the plaintiffs as to the financial condition of the patients or whether the patients requested or obtained financial hardship waivers, and that the defendant did not omit a material fact when submitting reimbursement claims. The Certificates of Coverage do not preclude financial hardship waivers and do not require the patients or providers, such as the defendant, to disclose hardship waivers to the plaintiffs, and the plaintiffs acknowledge that financial hardship waivers are legally permissible. As the claim forms submitted by the defendant to the plaintiffs for its services are silent regarding hardship waivers, the defendant's submissions made no representation regarding the patients' financial situation, or whether the patients had requested or obtained hardship waivers. As such, the lack of any misrepresentation or omission by the defendant demonstrates its entitlement to summary judgment dismissing the first cause of action (see Nerey v Greenpoint Mtge. Funding, Inc., 144 AD3d 646, 647; Williams v Eason, 49 AD3d 866, 867).
Second, concerning scienter, we agree with the Supreme Court's determination that the defendant did not waive co-payments and deductibles with the intent to defraud the plaintiffs (see Oxford Health Ins., Inc. v Josephson, 2010 NY Slip Op 32014[U] [Sup Ct, NY County]). Moreover, the plaintiffs' primary submissions concerning the issue of scienter constitute inadmissible hearsay in the form of excerpts from patient survey responses to questions that had been prepared by the plaintiffs' own employee/investigator (accord Alpha Invs., LLC v McGoldrick, 151 AD3d 800, 802; see Gomez v Kitchen & Bath by Linda Burkhardt, Inc., 170 AD3d 967, 969; see also Larkin v Sano-Rubin Constr. Co., Inc., 124 AD3d 1162, 1164; Westchester Med. Ctr. v Lincoln Glen Ins. Co., 60 AD3d 1045, 1046). These submissions, even if admissible, do not demonstrate that the defendant intentionally deceived the plaintiffs by granting knowingly improper waivers.
Third, regarding justifiable reliance, the plaintiffs allege that they would have reimbursed the defendant substantially less if they had known about the hardship waivers. However, irrespective of hardship waivers, the plaintiffs based their reimbursement decisions on UCR rates that had no relevance to the AWP prices submitted on the defendant's claim forms. Accordingly, because the plaintiffs paid the defendant based upon the UCR amount regardless of what AWP rate was cited in the defendant's claim submissions, the plaintiffs in determining reimbursement did not rely—justifiably or otherwise—on the AWP rate billed by the defendant (see Willis Ave Dev., LLC [*4]v Block 3400 Constr. Corp., 142 AD3d 993, 996; East End Cement & Stone, Inc. v Carnevale, 73 AD3d 974, 975; Great Atl. & Pac. Tea Co. v Friedman, 289 AD2d 198, 199).
We also agree with the Supreme Court's determination that the evidence submitted by the plaintiffs failed to establish that there was identity of the issues such that the federal action had preclusive effect in this action (see Weslowski v Zugibe, 167 AD3d 972, 975; Burgos v New York Village of Presbyt. Hosp., 155 AD3d 598, 600-601; Jensen v Old Westbury, 160 AD2d 768). Collateral estoppel, or issue preclusion, " precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same'" (Bank of N.Y. Mellon v Chamoula, 170 AD3d 788, 790, quoting Ryan v New York Tel. Co., 62 NY2d 494, 500; see Matter of Dunn, 24 NY3d 699, 704). "The party seeking to invoke collateral estoppel has the burden to show the identity of the issues, while the party trying to avoid application of the doctrine must establish the lack of a full and fair opportunity to litigate" (Bank of N.Y. Mellon v Chamoula, 170 AD3d at 790 [internal quotation marks omitted]).
We agree with the Supreme Court's determination that the issue underlying the first cause of action, i.e., whether the defendant committed fraud, was not decided in the federal action, which was an action commenced by the defendant as an assignee of B.K., and which alleged that the plaintiffs violated ERISA in reducing their reimbursement payments for B.K. The federal court, in dismissing the defendant's ERISA claim, held only that the plaintiffs' reduction of benefits to B.K. was "not unreasonable" in light of the defendant's failure to collect financial information from the family of B.K. to substantiate the hardship waiver, and did not hold that the defendant committed fraud in connection with B.K. or any of the 26 other patients at issue herein. Accordingly, we agree with the Supreme Court's determination that the defendant was not collaterally estopped by any rulings in the federal action (see Allied Chem. v Niagara Mohawk Power Corp., 72 NY2d 271, 276; Bank of N.Y. Mellon v Chamoula, 170 AD3d at 790).
The second cause of action, to recover damages for tortious interference with contract, alleges that the defendant intentionally interfered with the plaintiffs' contractual relationship with the patients by waiving and/or reducing co-payment and deductible payments, resulting in monetary damages to the plaintiffs. The elements of tortious interference with a contract are: "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff" (Kronos, Inc. v AVX Corp., 81 NY2d 90, 94; see Nero v Fiore, 165 AD3d 823, 825; Pacific Carlton Dev. Corp. v 752 Pac., LLC, 62 AD3d 677, 679). The plaintiff must also establish that the defendant intentionally procured the breach of contract "without justification" (Lama Holding Co. v Smith Barney, 88 NY2d 413, 424; Ferrandino & Son, Inc. v Wheaton Bldrs., Inc., LLC, 82 AD3d 1035, 1036).
We agree with the Supreme Court's determination granting that branch of the defendant's motion which was for summary judgment dismissing the second cause of action and denying that branch of the plaintiffs' cross motion which was for summary judgment on that cause of action. The defendant established its prima facie entitlement to judgment as a matter of law dismissing the second cause of action, and the plaintiffs failed to raise a triable issue of fact in opposition. We agree with the court's determination that, although it is undisputed that the Certificates of Coverage between the plaintiffs and the patients constituted contracts and that the defendant was aware of such contracts, the defendant did not intentionally interfere with those contracts, which did not disallow or preclude waiver of co-payments or deductibles, and did not prohibit the defendant from granting financial hardship waivers. The Certificates of Coverage are silent as to hardship waivers and do not preclude hardship waivers, as admitted by the plaintiffs, and the patients could not have breached their contracts by engaging in conduct that was not prohibited therein (see Toth v Taouil, 2019 NY Slip Op 30513[U] *7-8 [Sup Ct, NY County]; West 17th St. & Tenth Ave. Realty, LLC v N.E.W. Corp., 155 AD3d 478, 478; see also Iacono v Pilavas, 125 AD3d 811, 812-813; 82 Retail LLC v Eighty Two Condominium, 117 AD3d 587, 589).
Furthermore, even if there was a breach, we agree with the Supreme Court's [*5]determination that the defendant did not intentionally procure any breach of contract without justification (see Lama Holding Co. v Smith Barney, 88 NY2d at 424; Ferrandino & Son, Inc. v Wheaton Bldrs., Inc., LLC, 82 AD3d at 1036). Rather, the evidence demonstrates that the defendant billed patients for their payment responsibility after that amount had been ascertained from insurance companies such as the plaintiffs, and the defendant considered granting hardship waivers only upon request. Thus, we agree with the court's determination that the defendant's issuing of financial hardship waivers did not reflect any intentional procurement of a breach of contract (see Estate of Roth v Erhal Holding Corp., 141 AD2d 693, 695-696; see also Lama Holding Co. v Smith Barney, 88 NY2d at 424; Ferrandino & Son, Inc. v Wheaton Bldrs., Inc., LLC, 82 AD3d at 1036).
Furthermore, we agree with the Supreme Court's determination that the plaintiffs were not damaged by the defendant's invoicing at AWP rates, when the plaintiffs' reimbursement amounts were governed by unrelated UCR amounts. The plaintiffs' conjecture as to what the patients would have done in the absence of hardship waivers cannot establish the existence of compensable damages (see Martinez v City of New York, 153 AD3d 803, 806; Latuso v Maresca, 150 AD3d 712, 713; Grella v St. Francis Hosp., 149 AD3d 1046, 1049).
We also agree with the Supreme Court's determination to deny the plaintiffs' motion to strike certain evidence and legal arguments allegedly presented for the first time in the defendant's reply papers. The court stated that any such evidence and/or legal arguments were not considered in the determination of the defendant's motion, and as there is nothing in the record indicating otherwise, we accept the court's disclaimer that no consideration was given to the material in question (see Levine v Levine, 37 AD3d 553, 555; Republic Natl. Bank of N.Y. v Lupo, 215 AD2d 467, 467).
The plaintiffs' remaining contentions are without merit.
SCHEINKMAN, P.J., AUSTIN, HINDS-RADIX and LASALLE, JJ., concur.
ENTER:
Aprilanne Agostino
Clerk of the Court